1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| KARA HARDIE and KYLE O'BRIEN, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>REALPAGE, INC.; GREYSTAR REAL ESTATE PARTNERS, LLC; LINCOLN PROPERTY CO.; FPI MANAGEMENT, INC.; MID-AMERICA APARTMENT COMMUNITIES, INC.; AVENUE5 RESIDENTIAL, LLC; EQUITY RESIDENTIAL; ESSEX PROPERTY TRUST, INC.; THRIVE COMMUNITIES MANAGEMENT, LLC; and SECURITY PROPERTIES INC.,<br><br>     Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT
Case No.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE CASE ................................................................. 1

II.     PARTIES ................................................................................. 4

III.    JURISDICTION AND VENUE ......................................................... 6

IV.     BACKGROUND ......................................................................... 7

        A.    The Market for Multifamily Residential Real Estate Leases. ............... 7

        B.    Historical Pricing in the Market for Multifamily Residential Real
              Estate Leases. ................................................................. 8

        C.    The Lessor Defendants' Outsource Price and Supply Decisions to a
              Common Decision Maker – RealPage - Which Eliminated
              Competition. .................................................................. 8

        D.    The Lessor Defendants and RealPage Have Inflated the Prices and
              Reduced the Occupancy (i.e., Output) of Residential Real Estate
              Leases. ....................................................................... 12

        E.    "Plus Factors" Render the Market for Multifamily Residential Real
              Estate Leases Susceptible to the Formation, Maintenance, and
              Efficacy of a Cartel. ....................................................... 14

V.      CLASS ACTION ALLEGATIONS .................................................. 17

VI.     FRAUDULENT CONCEALMENT AND TOLLING .............................. 19

VII.    VIOLATIONS ALLEGED ............................................................ 19

COUNT I VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. §
        1) AGREEMENT IN RESTRAINT OF TRADE .......................... 19

VIII.   PRAYER FOR RELIEF ............................................................... 20

IX.     JURY TRIAL DEMANDED ......................................................... 20

CLASS ACTION COMPLAINT - i
Case No.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Plaintiffs Kara Hardie and Kyle O'Brien ("Plaintiffs"), by and through undersigned counsel, hereby brings this action on behalf of themselves and all others similarly situated to challenge a cartel among lessors of multifamily residential real estate leases ("Lessors") to artificially inflate the prices of multifamily residential real estate in the United States above competitive levels, and in support thereof, alleges as follows:

## I.  NATURE OF THE CASE

1.     Until approximately 2016, and potentially earlier, many of the nation's largest Lessors priced their leases based upon their own assessments of how to best compete against other Lessors. Lessors generally priced their units competitively to maximize occupancy (that is, maximizing output).  Lessors had an incentive to lower their prices to attract lessees away from their competitors, until all available leases were sold. In this way, competition drove rent levels to reflect available supply of rental units and lessee demand. Lessors also independently determined when to put their leases on the market, resulting in unpredictable supply levels - a natural phenomenon in a competitive market. When supply exceeded demand, Lessors cut prices.

2.     Traditionally, the residential real estate market is highly price competitive based on the fact that residential real estate is a perishable resource (if a unit sits vacant for a month, a Lessor can never monetize that lost month of rent).  For this reason, Lessors who are faced with the dilemma of competing with other Lessors for tenants have favored a strategy of competitive pricing to keep "heads in the beds," a term for offering sufficiently attractive lease pricing to maximize physical occupancy levels in multifamily residential real estate properties. The result of this is that even though Lessors collectively would be better off limiting rent reductions (discounts), individually Lessors know that one Lessor lowers its rents while the others don't, then that Lessor would outperform its competitors.  As a result, Lessors tended to charge competitive rents.

3.     However, beginning in approximately 2016, and potentially earlier, Lessors replaced their independent pricing and supply decisions with collusion. Lessors agreed to use a common third party that collected real-time pricing and supply levels, and then used that data to

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

make unit-specific pricing and supply recommendations. Lessors also agreed to follow these recommendations, with the understanding that competing Lessors would do the same.

4.     That third party that made this cartel coordination possible is RealPage, Inc. ("RealPage"). RealPage provides software and data analytics to Lessors. RealPage also serves as the mechanism by which Lessors collude and avoid competition, increasing lease prices to Plaintiffs and other members of the proposed Class. RealPage openly boasts that its services "balance supply and demand to maximize [Lessors'] revenue growth." And that is precisely what RealPage has done, facilitating an agreement among participating Lessors not to compete on price, and allowing Lessors to coordinate both pricing and supply through two mutually reinforcing mechanisms in furtherance of their agreed aim of suppressing price competition for multifamily residential real estate leases.

5.     First, Lessors outsource their own daily pricing and ongoing revenue oversight to RealPage, replacing separate centers of independent decision-making with one. RealPage collects up-to-the-minute data on the historical and contemporaneous pricing from participating Lessors, data that, according to RealPage, is updated "every time [Lessors] make or change a [lease] renewal offer," spanning over "16 million units," which is a "very large chunk of the total inventory in the country." RealPage standardizes this data to account for differences in the characteristics or "class" of the property in question, and then sets prices for participating Lessors using a common formula. RealPage touts that it sets pricing for Lessors' "properties as though we own them ourselves" – i.e., the RealPage led Lessor cartel replicates the market outcomes one would observe if prices were being set by a residential monopolist, which is the goal of any cartel.

6.     While Lessors are able to reject the RealPage pricing through an onerous process, RealPage emphasizes the need for "discipline" among participating Lessors. To encourage adherence to its common scheme, RealPage explains that for its services to be most effective in increasing rents, Lessors must accept the RealPage pricing at least eighty percent of the time. These efforts have been successful, with a RealPage employee explaining that as many as 90 percent (and at least 80 percent) of prices are adopted by participating Lessors without any

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

deviation.  As one Lessor explains, while "we are all technically competitors," RealPage "helps us work together," "to work with a community in pricing strategies, not to work separately."

7.      Second, RealPage allows participating Lessors to coordinate supply levels to avoid price competition. In a competitive residential real estate lease market, there are periods where supply exceeds demand, and that in turn puts downward pressure on market prices as firms compete to attract lessees. To avoid the consequences of lawful competition, RealPage provides Lessors with information sufficient to "stagger" lease renewals to avoid oversupply.  Thus, in order to implement their cartel, defendants frequently acted against their own economic best interest by holding vacant rental units unoccupied for periods of time (rejecting the historical adage to keep the "heads in the beds") to ensure that, collectively, there is not one period in which the market faces an oversupply of residential real estate properties for lease.  This coordination helped defendants keep their prices higher.

8.      By staggering lease renewals to artificially smooth out natural imbalances of supply and demand, RealPage and participating Lessors also eliminated incentives to undercut or cheat on the cartel (avoiding a race to the bottom, or "prisoner's dilemma").  This is a central mantra of RealPage, to sacrifice "physical" occupancy (i.e., to decrease output) in exchange for "economic" occupancy, a manufactured term RealPage uses to refer to increasing prices and decreasing occupancy (output) in the market.

9.      RealPage's and participating Lessors' coordinated efforts have been effective at driving anticompetitive outcomes: higher prices and lower occupancy (output).  RealPage brags that participating Lessors experience "[r]ental rate improvements, year over year, between 5% and 12% in every market." One Lessor said that the net effect of raising rents and "pushing people out" of the residential real estate leases they could no longer afford, was "10 million in income." As discussed below, RealPage and participating Lessors have accomplished this task even under market downturns such as the Covid-19 pandemic.

10.     RealPage is proud of its role in the exploding increase in the prices of residential leases.  In a marketing video used to attract additional Lessors to the conspiracy, a RealPage Vice President discussed the recent and never-before seen price increases for residential real estate

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

leases, as high as 14.5% in some markets. When another RealPage executive asks: "What role has the [RealPage] software played" in those increases, the RealPage Vice President responded: "I think it's driving it, quite honestly."

11.     The conspiracy Plaintiffs challenge is unlawful under Section 1 of the Sherman Act. Plaintiffs bring this action to recover their damages, trebled, as well as injunctive and other appropriate relief, detailed *infra*, on behalf of all others similarly situated.

## II.     PARTIES

12.     Plaintiffs Kara Hardie and Kyle O'Brien are United States citizens and residents of the Commonwealth of Pennsylvania.  Ms. Hardie and Dr. O'Brien rented a multifamily residential unit in a property managed by Lessor Defendant Greystar Real Estate Partners LLP located in Philadelphia, Pennsylvania beginning in 2022 through the present.  Ms. Hardie and Dr. O'Brien have paid higher rental prices due to the antitrust violations alleged herein.

13.     Defendant RealPage, Inc. is a Delaware corporation headquartered in Richardson, Texas.  RealPage was a public company from 2010 until December 2020, when it was purchased by private equity firm Thoma Bravo in a transaction that valued RealPage at approximately $10.2 billion. RealPage provides software and services to the residential real estate industry, including the RMS described herein. RealPage has thousands of employees and earns over a billion dollars per year in revenue. As of December 31, 2019, RealPage had over 29,800 clients, including each of the ten largest multifamily property management companies in the United States.

14.     Lessor Defendant Greystar Real Estate Partners, LLC ("Greystar") is a Delaware limited liability corporation headquartered in Charleston, South Carolina. It is the largest manager of multifamily rental real estate in the United States, with more than 782,900 multifamily units and student beds under management nationally. On information and belief, Greystar earns billions of dollars per year in revenue, controls $35.5 billion dollars in assets, and employs over 20,000 people.

15.     Lessor Defendant Lincoln Property Co. ("Lincoln") is a Texas corporation headquartered in Dallas, Texas. Lincoln is the second largest manager of multifamily rental real estate in the United States, with over 210,000 multifamily units under management nationally.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

1  On information and belief, Lincoln earns billions of dollars per year in revenue and employs

2  thousands of people.

3     16.   Lessor Defendant FPI Management, Inc. ("FPI") is a California corporation

4  headquartered in Folsom, California. FPI is the fifth largest manager of multifamily rental real

5  estate in the United States, with over 150,000 multifamily units under management in 17 states.

6  On information and belief, FPI earns billions of dollars per year in revenue and employs thousands

7  of people.

8     17.   Lessor Defendant Mid-America Apartment Communities, Inc. ("MAA") is a

9  Tennessee corporation headquartered in Germantown, Tennessee. MAA is the tenth largest

10 manager of multifamily rental real estate in the United States, with over 100,000 multifamily units

11 under management in 16 states. On information and belief, MAA earns over one billion dollars

12 per year in revenue and employs over 2,400 people.

13    18.   Lessor Defendant Avenue5 Residential, LLC ("Avenue5") is a Delaware limited

14 liability company headquartered in Seattle, Washington. Avenue5 is the twelfth largest manager

15 of multifamily rental real estate in the United States, with over 96,900 multifamily units under

16 management in 12 states. On information and belief, Avenue5 earns over $500 million dollars per

17 year in revenue and employs over one thousand people.

18    19.   Lessor Defendant Equity Residential ("Equity") is a Maryland real estate

19 investment trust headquartered in Chicago, Illinois. Equity is the sixteenth largest manager of

20 multifamily rental real estate in the United States, with over 80,000 units under management in

21 eight states. On information and belief, Equity earns over 2 billion dollars per year in revenue and

22 employs over 2,000 people.

23    20.   Lessor Defendant Essex Property Trust, Inc ("Essex") is a Maryland corporation

24 headquartered in San Mateo, California. Equity is the twenty-fourth largest manager of

25 multifamily rental real estate in the United States, with over 61,000 units under management in

26 California and Washington. On information and belief, Essex earns over 1.4 billion dollars per

27 year in revenue and employs over 1,700 people.

28


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

21.     Lessor Defendant Thrive Communities Management, LLC ("Thrive") is a Washington Limited Liability Company headquartered in Seattle, Washington. Thrive has over 18,000 units under management in the greater Pacific Northwest. On information and belief, Thrive earns millions of dollars per year in revenue and employs over 500 people.

22.     Lessor Defendant Security Properties Inc. ("Security Properties) is a Washington corporation headquartered in Seattle, Washington. Security Properties has over 22,000 units under management in eighteen states. On information and belief, Security Properties earns millions of dollars per year in revenue.

23.     The Lessor Co-Conspirators are various persons and entities, including Lessors, known and unknown to Plaintiffs, and not named as defendants in this action, who have participated as co-conspirators with RealPage and the Lessor Defendants in the offenses alleged and have performed acts and made statements in furtherance of the conspiracy.

### III.     JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

25.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and Washington's long-arm statute, Wash. Rev. Code § 4.28.185

26.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the sale of multifamily residential real estate leases.

27.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of multifamily residential real estate leases.

28.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this



District and certain unlawful acts alleged herein were performed and had effects within this District.

## IV.  BACKGROUND

**A.  The Market for Multifamily Residential Real Estate Leases.**

29.    The relevant product market is the market for the lease of multifamily residential real estate and the relevant geographic market is the United States.

30.    From the perspective of the consumer, multifamily rental apartment units are not an economic substitute for apartments, condominiums, or homes for purchase because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing.

31.    Additionally, from the perspective of the consumer, single-family real estate is not an economic substitute for multifamily residential real estate. For example, single-family properties typically do not offer amenities and security comparable to what is offered by multifamily residential real estate.  Indeed, industry participants in the multifamily residential real estate market typically distinguish between multifamily and single-family real estate when discussing customer preferences and market trends, including concerning their disparate respective pricing.

32.    The multifamily residential real estate lease market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined.  If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

33.    Here, the SSNIP test is satisfied, and the market is properly defined.  As described above and below, pursuant to the Lessors' agreement not to compete on price, Lessors have been able to increase rent prices year over year, between 5% and 12% in every market, yet those

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

increases have not driven enough renters out of the market such that the SSNIP has become unprofitable to Lessors.

**B.    Historical Pricing in the Market for Multifamily Residential Real Estate Leases.**

34.    Before RealPage facilitated collusion among Lessors, Lessors acting independently followed a policy to keep "heads in the beds."  In simplest terms, this meant the market was functioning competitively.  Lessors, concerned that every day a property remained unrented was a lost opportunity to earn revenue for that day, offered sufficiently attractive pricing to maintain maximum "physical occupancy" across their units.  This could come in the form of reduced prices that were often described as incentives or concessions, such as "first month free."

35.    The "heads in the beds" strategy also minimized turnover expenses to the extent that there are hard costs associated with finding and evaluating a replacement tenant as well as lost revenue opportunities if a unit sits vacant between tenants.

36.    One industry participant described the market focus on occupancy before RealPage's arrival, stating that it was commonly believed that if a property was not 95 percent-plus occupied, the asset was failing.

37.    Lessors accomplished their goals of maximizing occupancy ("keeping heads in the beds") through "manual pricing," that is, uncoordinated, independent pricing.  Thus, Lessors maximized occupancy (output) by offering sufficiently low pricing to attract tenants to sign or renew existing leases.  This is referred to as a market share over price strategy, and it is a common defining characteristic of a market that is functioning competitively.

**C.    The Lessor Defendants' Outsource Price and Supply Decisions to a Common Decision Maker – RealPage – Which Eliminated Competition.**

38.    Following RealPage's entry, RealPage's participating Lessors swiftly, and concertedly, shifted from the previous competitive market share over price strategy to a new collusive price over volume strategy.  Price over volume is a hallmark of pricing in a cartelized market.

39.    RealPage and participating Lessors have adopted a philosophy of economic occupancy, a term RealPage itself uses to refer to the practice of increasing prices notwithstanding



market conditions and tolerating any reduced physical occupancy that might engender.  Since Lessors of residential multifamily real estate properties (a finite resource) face a natural prisoner's dilemma, maximizing economic occupancy is only in a firm's economic self-interest if many Lessors collectively follow suit.  Lessors could realize higher profits if all Lessors limited rent reductions (discounts).  However, in a competitive market, a Lessor who lowered its rents while its competitors didn't, would outperform its competitors by capturing more business.  Accordingly, the threat of a competitor offering a lower price results in Lessors offering lower competitive prices.  However, the easiest way to solve the prisoner's dilemma, such that it would be profit maximizing to maintain high prices, would be if Lessors had mutual assurances that other Lessors would not compete with them on price.

40.    The cartel among RealPage and participating Lessors provides the participants mutual assurances that they will not undercut the cartel prices, agreeing among themselves not to compete on price for the sale of multifamily residential real estate leases. They have effectuated their agreement through two mutually reinforcing mechanisms. First, participating Lessors have agreed to set prices using RealPage's coordinated algorithmic pricing. Second, participating Lessors have agreed to stagger their lease renewal dates through RealPage, to avoid (otherwise natural) oversupplies in rental properties.

41.    RealPage's coordinated algorithmic pricing allows participating Lessors, in RealPage's words, to "outsource [their] daily pricing and ongoing revenue oversight" to RealPage, with RealPage pricing participating Lessors' "properties as if we [RealPage] own them ourselves" – in other words, RealPage has admitted that its algorithmic pricing is effective because it allows RealPage and its participating Lessors to effectively operate as a monopolist.

42.    Participating Lessors agree to adhere to RealPage's coordinated algorithmic pricing, often referring to such adherence as pricing "courage" or more frequently, pricing "discipline."

43.    Participating Lessors also agree to provide RealPage with real-time access to their competitively sensitive and nonpublic data on their multifamily residential real estate leases.

CLASS ACTION COMPLAINT - 9
Case No.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

44.     This data, according to RealPage, spans over "16 million units," which is a "very large chunk of the total inventory in the country." RealPage standardizes this data to account for differences in the characteristics or "class" of the property in question. RealPage then runs this massive dataset through its pricing algorithm, whereby RealPage sets prices for participating Lessors through application of a common formula to a common dataset.

45.     Specifically, every morning, RealPage provides participating Lessors with recommended price levels. Lessors typically must communicate to a RealPage "Pricing Advisor" that they have accepted or confirmed the RealPage approved pricing within a specified time frame. If Lessors wish to diverge from the approved pricing, they must submit reasoning for doing so and await approval. RealPage encourages participating Lessors to have daily calls between the Lessors' employees with pricing responsibility and the RealPage Pricing Advisor.

46.     RealPage emphasizes the need for discipline among participating Lessors and urges them that for its coordinated algorithmic pricing to be the most successful in increasing rents, participating Lessors must adopt RealPage's pricing at least 80% of the time. If there is a disagreement between the participating Lessor and the RealPage Pricing Advisor, the dispute is often elevated to the Lessor's management for resolution, and specific reasons justifying a departure from RealPage's pricing level are usually required.

47.     One example of RealPage's need for policing its cartel in order to encourage pricing discipline among participating Lessors was stated by Jeffrey Roper, RealPage's main architect, who publicly described the problem as: "If you have idiots undervaluing [setting prices independently], it costs the whole system."

48.     A RealPage employee reported that RealPage's pricing discipline has been successful, with as many as 90% (and at least 80%) of RealPage pricing being adopted by cartel members. As one Lessor explained, RealPage's coordinated algorithmic pricing required Lessors to act against their own best interest by making counterintuitive changes in their business practices because, upon adopting RealPage's coordination of pricing, Lessors were no longer offering concessions nor were they able to negotiate pricing like they previously had. That Lessor went on to explain that RealPage "maximize[s] rents but you have to be willing to strictly follow it," and,

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

as a result, "we rarely make any overrides to the recommendations" provided by RealPage. Another Lessor described RealPage as bringing "discipline" and "courage to pricing."

49.     In addition to coordinating and artificially inflating prices, RealPage helped to restrict the supply of rental properties.  Using software it designed, applied to the dataset participating Lessors agreed to provide it, RealPage also facilitates staggering lease renewals by participating Lessors to avoid natural periods of oversupply that would persist absent concerted action by would-be rival Lessors.

50.     One Lessor explained that, using RealPage, Lessors are "now able to stagger lease expirations throughout the month, effectively cutting down on frictional vacancy loss as well as concessions" on price. That Lessor continued that by staggering lease renewals, Lessors have "leveled the lease expirations throughout the year to better match the historical demand for each community, thus positioning us [Lessors] for even higher rent growth."

51.     Lessors have publicly admitted that RealPage has allowed them to maintain higher prices in concert, with confidence that they can avoid price cutting and the prisoner's dilemma.

52.     This same Lessor commented that while "we [Lessors] are all technically competitors," that Lessors' common adoption of and adherence to RealPage's software "helps us [Lessors] work together," "to work with a community in pricing strategies, not to work separately."

53.     Other Lessors' comments echo the potency and efficacy of their concerted action.

54.     Another Lessor reported that RealPage "has given a substantial boost to economic occupancy" (the proportion of gross potential rent actually realized vs. physical occupancy, the proportion of units occupied by tenants), which is to say it caused higher prices and less output.

55.     Another Lessor explained that by "outsourcing" pricing functions to RealPage, prices are set by RealPage's "multifamily experts," who describe themselves as "an extension of your leasing and marketing team."

56.     And another explained that in following the cartel's price over volume, or economic capacity, strategy, they found "that driving our turnover rate up actually captured additional revenue." The Lessor continued: "The net effect of driving revenue and pushing people

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

out was $10 million in income." And the Lessor concluded, "I think that shows that keeping the heads in the beds above all else is not always the best strategy." But given the prisoner's dilemma faced by Lessors in a competitive market, rejecting the traditional competitive "heads in beds" strategy of maximizing occupancy is only in a Lessor's economic self-interest if they have assurances that they will not be significantly undercut by a rival. RealPage provides a mechanism through which Lessors reach a common understanding, coordinate their prices, and effectuate that understanding.

**D.    The Lessor Defendants and RealPage Have Inflated the Prices and Reduced the Occupancy (i.e., Output) of Residential Real Estate Leases.**

57.    As industry participants including RealPage's own executives admit, RealPage's coordinated algorithmic pricing has caused anticompetitive effects in the form of higher prices and reduced output, with a RealPage executive conceding: "I think  [RealPage's coordinated algorithmic pricing is] driving it [higher prices for residential real estate leases], quite honestly.'"

58.    RealPage advertises that the Lessors who participate in the cartel experience "[r]ental rate improvements, year over year, between 5% to 12% in every market," the ability to "outperform the market by up to 5%," and "drive up to an additional 150-200 basis points of hidden yield" that would not otherwise be attainable to a Lessor utilizing independent pricing, rather than coordinated pricing. RealPage refers to independent, competitive pricing as "manual pricing."  RealPage claims to "outperform manual pricing" by 7 percent each year.  That is, the Lessors' collusion succeeds in increasing prices above competitive levels by 7 percent each year.

59.    To conclude that these price increases would be economically irrational and against each Lessors' independent economic self-interest if acting alone (that is, absent assurances that other Lessors would also be exercising pricing "discipline"), or that price increases would be unachievable absent the implementation of coordinated algorithmic pricing by RealPage's participating Lessors, one need look no further than the admissions of RealPage and Lessors, who openly extol the value of cartelization (higher prices, lower output) to each other.

CLASS ACTION COMPLAINT - 12
Case No.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

60.     One Lessor's representative explained, "the beauty of using [RealPage's pricing] is that it pushes [Lessors] to go places that you wouldn't have gone on your own if you weren't using it."

61.     Another Lessor's representative told panelists at an industry conference that it "raised rents hundreds of dollars," following RealPage's pricing, and noting that the Lessor would not have had "the courage to push [rents] as aggressively as [the RealPage pricing] program has."

62.     Another Lessor admitted that, in the natural state of play, it simply is "not in [a Lessor's] DNA to raise pricing $150 to $200 per unit on a lease turn," but following RealPage's coordinated algorithmic pricing allowed the Lessor to do what, independently, it would not.

63.     And yet another Lessor noted that, "[i]n our Florida markets, we let the system push as hard as it would go, and we saw increases as high as 20 percent. . . . Left to our own devices, I can assure you we would have never pushed rents that hard. That was a big number."

64.     And still yet another Lessor observed that it was able to raise rents in situations where market conditions dictated otherwise, with a consultant for that Lessor conceding that "[i]f you'd listened to your gut, you would have lowered your price."

65.     RealPage itself concedes that these price levels could not be obtained independently, stating: "We believe in overseeing properties as though we own them ourselves. We believe we can deliver better results for you than you would otherwise be able to achieve." In plain terms, RealPage concedes that its coordinated algorithmic pricing allows Lessors to obtain the same results as a single seller or monopolist-an outcome Lessors "would not otherwise be able to achieve" without RealPage's pricing and assurances of Lessors' discipline to that pricing.

66.     The Covid-19 pandemic is a prime illustration of Lessors' ability to coordinate pricing through RealPage and achieve market outcomes untethered to what one would expect if Lessors were acting independently of one another. A RealPage Vice President of Revenue Management explained that "at the start of Covid, I think a lot of our [Lessors'] initial reaction, was, 'oh I need to start dropping rent, I need to start giving concessions" to account for the exodus of renters from major metropolitan areas. But "our [RealPage's] advisory team and the product did a great job" of resisting that natural competitive outcome. Another RealPage employee agreed

with that assessment, noting "we just saw unbelievable resilience and I would say discipline in pricing through the worst of the downturns . . . a lot of people thought we'd see severe rent cuts; that just didn't happen." That "resilience" and "discipline" is "unbelievable" precisely because absent assurances that competitor Lessors are not going to undercut a given Lessor on price, such discipline is against the Lessor's individual economic self-interest.

67.     RealPage has undertaken this conduct with full and complete knowledge of its illegality. One of RealPage's pricing software's main architects, Jeffery Roper, is acutely familiar with the anticompetitive nature of coordinated algorithmic pricing within an industry. Before pioneering RealPage's software, Roper was Alaska Airlines' Director of Revenue Management when it and other airlines began using common software to share nonpublic planned routes and prices with each other, with the aim of heading off price wars. The Department of Justice's Antitrust Division ("DOJ") reached settlements or consent decrees for price fixing violations with eight airlines, including Alaska Airlines. Roper-who had his computer and documents seized by federal agents-relayed about that experience that, "We all got called up before the Department of Justice in the early 1980s because we were colluding." He adds that at the time, "We had no idea" that conduct was unlawful. Having now brought analogous coordinated algorithmic pricing to multifamily residential real estate leasing after the DOJ's airline settlements, however, Roper can no longer claim ignorance of the unlawful nature of this conduct.

**E.     "Plus Factors" Render the Market for Multifamily Residential Real Estate Leases Susceptible to the Formation, Maintenance, and Efficacy of a Cartel.**

68.     The market for the sale of multifamily residential real estate leases from Lessors to lessees is characterized by numerous features, referred to as "plus factors," that render the it susceptible to collusion such that the formation, maintenance, and efficacy of a cartel is more likely. These include (1) high barriers to entry, (2) high barriers to exit, (3) market concentration, (4) inelastic consumer demand, (5) the relative fungibility of residential real estate leases, (6) exchanges of competitively sensitive information among horizontal competitors, and (7) numerous opportunities to collude at trade associations and RealPage functions.



69.     First, multifamily residential real estate properties owners and operators face significant entry barriers. These include the high cost of acquiring property, establishing a property management infrastructure, and ongoing costs of building maintenance and regulatory compliance. Even small multifamily rental properties typically cost millions of dollars to acquire. Large properties, such as those operated by Greystar, run into the hundreds of millions of dollars to own and manage and take several years and significant experience to build or acquire. Thus, new entrants into the multifamily residential real estate leasing market are unlikely to discipline cartel pricing.

70.     Second, lessees of multifamily residential real estate properties face high exit barriers. Renters typically incur substantial cost and inconvenience when moving, and where price escalation is occurring in broad geographic areas, they might not have a lower priced option in reasonable proximity to where they currently live or work. Accordingly, lessees cannot easily turn to alternative Lessors of multifamily residential real estate properties to discipline cartel pricing.

71.     Third, the demand for multifamily residential real estate property leases is relatively inelastic. The only realistic alternative to renting is buying, and for most renters, due to finances or logistics, that is not an option.  Thus, no reasonable substitutes exist to discipline cartel pricing.

72.     Fourth, the market for multifamily residential real estate property leases is highly concentrated. Most major metropolitan areas are dominated by relatively few sellers, with many large corporations like Greystar having substantial presences in metropolitan areas throughout the United States.

73.     Fifth, multifamily residential real estate properties are relatively fungible, particularly within classes of properties. That is, when controlling for certain high-level characteristics of properties-such as the number of bedrooms and bathrooms, amenities, location, or the age of the building, properties within those classes are relatively fungible. Lessors have explained that RealPage's pricing software "is correctly looking at 'like' competitor properties and 'truly comparing apples to apples' as it relates to competitor apartment pricing."

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

74.     Sixth, RealPage's participating Lessors, directly and by using RealPage as a conduit, share competitively sensitive information with one another. In addition to its price-setting and lease renewal-staggering services, RealPage collects non-public data on multifamily residential real estate properties and creates benchmarking reports that allow for quick comparisons of a Lessor's performance on occupancy and price for similar property classes vis-à-vis the industry. This function could not be recreated using any public, non-competitively sensitive sources as the advertised rates for residential real estate leases typically diverge from the actual rates.

75.     Seventh, RealPage and participating Lessors have ample opportunities to collude. As just one example, RealPage operates a private RealPage User Group Forum, an association of some thousand participating Lessors, which, according to RealPage, aims "to improve communications between RealPage and the user [Lessor] community," while "promot[ing] communication between users [Lessors]" themselves. Within that Forum is an "Idea Exchange," where Lessors submit their own recommendations for changes or improvements to RealPage's offerings, as well as provide comments on proposed changes that RealPage is considering implementing to its software offerings.

76.     Another example of RealPage facilitating an opportunity for Lessors to conspire is the fact that RealPage organizes certain in-person events and collaboration among participating Lessors.  It invites some to serve on a "Steering Committee," which liaises with certain subcommittees of the RealPage User Group Forum to ascertain Lessors' suggestions for RealPage's software offerings and with the explicit instruction to consider "the mutual benefit of all users."  RealPage also organizes a marquee annual, multi-day event called "RealWorld," where Lessors gather along with approved partners and executives from RealPage to network, exchange insights into key initiatives in the industry, and learn best practices for using RealPage tools.  Over the past five years, those conferences have been held in Las Vegas, NV, Nashville, TN, Orlando, FL, and virtually during the Covid-19 pandemic.

77.     RealPage has also invited Lessors to attend periodic "summits" to discuss RealPage's pricing software with RealPage and with one another, covering topics including (1)

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

"Competitive Rent Analysis" or "[m]ethods of establishing and maintaining amenity-based prices for each unit and floor plan, factoring in comparable peer pricing," (2) "Supply Forecasts" and "Demand Forecasts," as well as (3) RealPage's "Pricing Engine," or "[m]ethods to price units in real time based on statistically validated price elasticity models."

78.     Finally, industry trade associations offer RealPage and participating Lessors additional opportunities to conspire. As an illustrative example, the National Multifamily Housing Council ("NMHC"), which advertises itself as "the place where the leaders of the apartment industry come together to guide their future success," holds several events every year, including in person "Apartment Strategy Conference," an "Annual Meeting," a "Fall Meeting," hosted in cities including San Diego, CA, Las Vegas, NV, and Washington, DC. NMHC counts among its "Chair's Circle Sponsors" RealPage, Greystar, and more participating Lessors. Of note, NMHC "tracks market conditions through NMHC member surveys as well as data from data provider partners," to provide "industry benchmarks" on topics including "In Place Rent Per Square Foot," "Rent Change - New Leases," and "Rent Change - Renewals."

## V.     CLASS ACTION ALLEGATIONS

79.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> All persons and entities in the United States and its territories that are direct purchasers of multifamily residential real estate leases from a Lessor participating in RealPage's pricing software and/or lease renewal staggering software programs, or from a division, subsidiary, predecessor, agent, or affiliate of such Lessor, at any time during the period of October 18, 2018 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

80.     Excluded from the Class are Defendants and their officers, directors, management, employees, parents, subsidiaries, affiliates, and co-conspirators.  Also excluded are: any federal, state or local governmental entities and their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; any judicial officers presiding over this action,



(including law clerks), any person within three degrees of relationship to those living in a judicial officers' household, and the spouses of all such persons.

81. The Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands if not hundreds of thousands of members in the proposed Class.

82. Plaintiffs' claims are typical of those of the Class.

83. Plaintiffs and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more for multifamily residential leases than they otherwise would have in a competitive market.

84. Plaintiffs will fairly and adequately protect and represent the interests of the Class and the interests of the Plaintiffs are not antagonistic to the Class.

85. Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual class members, since the Defendants have acted and refused to act on grounds generally applicable to the Class.

86. Questions of law and fact common to the Class include:

- Whether Defendants have entered into a formal or informal contract, combination, conspiracy, cartel, or common understanding to artificially inflate price and/or artificially suppress supply of multifamily residential real estate leases from competitive levels;

- If Defendants entered into such a formal or informal contract, combination, conspiracy, cartel, or common understanding, whether that conduct violates Section 1 of the Sherman Act under the per se, quick look, or rule of reason modes of analysis;

- If Defendants entered into such a formal or informal contract, combination, conspiracy, cartel, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply of multifamily residential real estate leases from competitive levels;

- The proper measure of damages; and

- The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

87. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

CLASS ACTION COMPLAINT - 18
Case No.



88.     Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## VI.     FRAUDULENT CONCEALMENT AND TOLLING

89.     Any applicable statute of limitations for Plaintiffs and the Class has been tolled with respect to any claims and rights of action that Plaintiffs and the Class have as a result of the unlawful combination and conspiracy alleged in this Complaint. Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' concealment of the conspiracy.

90.     Plaintiffs and the Class were not placed on actual or constructive notice of the illegal nature of the conspiracy alleged herein until, at the earliest, October 15, 2022, when ProPublica published the results of its investigation into the anticompetitive conduct alleged herein.  Specifically, ProPublica's October 15, 2022, article set forth the findings of its ongoing investigation into the Defendants anticompetitive conduct and made public allegations regarding how RealPage and the Lessors restrained competition and caused higher prices in the multifamily residential real estate lease market.

## VII.     VIOLATIONS ALLEGED

## COUNT I

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) AGREEMENT IN RESTRAINT OF TRADE

91.     Plaintiffs repeats and realleges each of the allegations contained in the previous paragraphs as if fully set forth herein.

CLASS ACTION COMPLAINT - 19
Case No.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

92.     Defendants have formed a cartel to artificially inflate the price of and artificially decrease the supply and output of multifamily residential real estate leases from competitive levels.

93.     The Defendants' cartel has caused the Plaintiffs and the Class to suffer overcharge damages.

94.     There are no procompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

95.     The Defendants' cartel is unlawful under a per se mode of analysis. In the alternative, the Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class of all others so similarly situated, respectfully requests the following relief:

A.      A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed class representatives, and that Plaintiffs' counsel be appointed as class counsel.

B.      A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act under either a per se, quick look, or rule of reason mode of analysis.

C.      A judgment enjoining Defendants from engaging in further unlawful conduct.

D.      An award of attorneys' fees and costs.

E.      An award of pre- and post-judgment interest on all amounts awarded; and

F.      Such other relief as the Court deems equitable and just.

## IX.      JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial as to all issues triable by a jury.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Dated: January 11, 2023          Respectfully submitted,

By: /s/ Steve W. Berman
   Steve W. Berman WSB #12536
By: /s/ Breanna Van Engelen
   Breanna Van Engelen WSB #49213
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

*Local Counsel for Plaintiffs*

Austin Cohen, Esquire*
Keith Verrier, Esquire*
**LEVIN SEDRAN & BERMAN**
510 Walnut Street, Ste. 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
acohen@lfsblaw.com
kverrier@lfsblaw.com

*Counsel for Plaintiffs and the Proposed Class*

*motion for admission *pro hac vice* forthcoming

CLASS ACTION COMPLAINT - 21
Case No.

